UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SCOTT L. FENSTERMAKER,<br>    *Plaintiff*,<br><br>    v.<br><br>PNC BANK, NATIONAL ASSOCIATION,<br>*et al.*,<br>    *Defendants*. | No. 3:17-cv-00778 (JAM) |

**ORDER GRANTING MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT**

    Plaintiff Scott Fenstermaker is a lawyer who has been embroiled in conflict with his family for many years. His father—who is still alive—has recently re-written his will and a living trust to disinherit him. Plaintiff thinks he did so because of undue influence by plaintiff's sister and plaintiff's ex-wife. Plaintiff also thinks his father wrote him out of his will because he did not like the fact that plaintiff has represented Guantanamo Bay terrorist defendants and been quoted in the newspaper saying that the terrorist attacks of 9/11 were "deserved" and "one of the greatest events in human history."

    Plaintiff has now filed this lawsuit against his father, his sister, and a bank solely in its capacity as trustee for his father's *inter vivos* trust. Defendants have moved to dismiss and for summary judgment. Because plaintiff's father is still living, I will grant their motions in large part on grounds that plaintiff does not yet have an injury-in-fact from his father's re-writing of his will and related trust documents and that his challenge to his father's will and trust is not yet ripe for decision. As to plaintiff's demand that his father and sister pay him $2 million for intentional infliction of emotional distress, I conclude that plaintiff does not allege plausible grounds for relief.

1

## BACKGROUND

The following facts are drawn unless otherwise noted from the amended complaint. Doc. #70. In 2012 plaintiff was serving as the attorney-in-fact and later as the executor of the estate for his uncle. *Id.* at 8. According to plaintiff, various family members, including his sister, defendant Martha Czymmek, demanded that he illegally transfer money from his uncle's estate to another relative. *Id.* at 8–9. Czymmek allegedly exerted this pressure in order to "illegally enrich herself." *Id.* at 30. These demands allegedly continued until plaintiff retained an attorney and threatened legal action. *Id.* at 9.

Plaintiff alleges that Czymmek's anger at his refusal to transfer the funds prompted her to begin a campaign to undermine plaintiff's relationship with their father, defendant Lloyd Fenstermaker, and to interfere with plaintiff's expected inheritance from his father. *Id.* at 10. Indeed, soon after the 2012 family dispute, Lloyd Fenstermaker removed plaintiff as the executor of his estate and replaced him with Czymmek. *Id.* at 13. This decision was but the first step in Czymmek's alleged plot to have Lloyd Fenstermaker disinherit plaintiff. *Id.* at 22–23, 32.

Over the following several years, Lloyd Fenstermaker's health deteriorated, and Czymmek assumed responsibility to care for her father and manage his affairs. She obtained a general power-of-attorney and has attended to his legal and financial matters. *Id.* at 13. Her father also appointed her as a healthcare proxy to make health care decisions for him. *Ibid.* Plaintiff views Czymmek's care for her father as seizing control and part of her "plan to ingratiate herself" in order to exclude plaintiff from their father's will. *Id.* at 31.

Plaintiff further faults Czymmek for the fact that he has not communicated with Lloyd Fenstermaker since April 21, 2016, and claims she is still holding their father "incommunicado."

*Id.* at 6.[1] He also alleges that his father's attorney falsely stated that plaintiff's father did not want plaintiff to know his address or whereabouts because plaintiff had made threats against him. *Id.* at 7. Plaintiff denies that he has made such threats and claims that Czymmek hired the attorney to make this false claim. *Ibid.*

In 2016, Lloyd Fenstermaker executed a series of wills that replaced his earlier estate plans. On July 19, 2016, he executed a new will that excluded plaintiff as a beneficiary. Doc. #58-1 at 3, 6–16. This will revoked Lloyd Fenstermaker's earlier will, which had divided his estate into three equal shares between his three children. Under the terms of the new will, Lloyd Fenstermaker's estate would be divided in three equal shares between two of his children, Martha Czymmek and Stephen Fenstermaker, and plaintiff's ex-wife, Linda Fenstermaker. This will was updated on October 5, 2016, to correct a misspelling of Martha Czymmek's last name. *Id.* at 4, 17–27.

In October of 2016, Lloyd Fenstermaker fell and fractured his hip. Doc. #70 at 12. He was treated at a facility in Delaware until some point in December of 2016. *Ibid.* During this time, he received extensive medical treatment and appeared to exhibit diminished cognitive capacity. *Ibid.*

After this incident, Lloyd Fenstermaker executed a third will and revocable living (*inter vivos*) trust on November 23, 2016. Doc. #34 at 3. The third will and trust also excluded plaintiff as a beneficiary. Due to a scrivener's error, Lloyd Fenstermaker executed a corrected will and

---

[1] Plaintiff's allegation that it was his sister who is responsible for his father not communicating with him is not consistent with documents in the record from April 2016 reflecting plaintiff's own efforts to cut off communications with his father. On April 21, 2016, plaintiff sent an email asking his father to "cease communications with me" and that "I've taken your shit for 53 years," and "[a]s of today, I will no longer do so. Goodbye." Doc. #36-3 at 2. A day later he wrote again to father, stating: "please cease communicating with me. Any further communications from you will be ignored. Goodbye." Doc. #36-4 at 2. In July 2016, plaintiff sent his father an envelope addressed to "Mr. Lloyd Fensterfuck." Doc. #36-5 at 2.

trust on November 28, 2016. Doc. #70 at 14; Doc. #34 at 4; Doc. #36-1 at 2–4, Doc. #36-2 at 2–21.

These updated instruments are the primary subjects of this lawsuit. Under the terms of the updated will, Lloyd Fenstermaker's entire estate, absent personal effects, is to be distributed into the revocable *inter vivos* trust with defendant PNC Bank, National Association, acting as trustee. According to plaintiff, his father's net worth is about $1.5 million. Doc. #70 at 33 n.12. The terms of the trust provide that it is fully revocable by Lloyd Fenstermaker and that the income from the trust shall be distributed to Lloyd Fenstermaker during his lifetime and then only upon his death shall the trust property be divided in three equal shares for the benefit of Martha Czymmek, Stephen Fenstermaker, and Linda Fenstermaker. Doc. #36-2 at 2, 7–8. Both the updated will and trust explicitly exclude plaintiff as a named beneficiary. Doc. #70 at 14. Plaintiff was provided notice pursuant to Delaware law to bring a legal challenge to the will and trust on January 17, 2017. *Id.* at 14–15.

Plaintiff alleges that he has represented a number of alleged terrorist detainees at Guantanamo Bay in Cuba. *Id.* at 18–19. According to plaintiff, his father disinherited him to punish him for his choice to represent these defendants. *Id.* at 19–21, 25. He claims his father also intended to punish him for taking certain positions as part of his legal defense of alleged terrorists and while running as a candidate for the U.S. Congress. *Id.* at 21. Such positions include plaintiff's stated view as reported in a *New York Daily News* article that the 9/11 attack on the World Trade Center was "deserved" and "one of the greatest events in human history." *Id.* at 20.[2] According to plaintiff, his father's decision to disinherit him as a result of his defense of

---

[2] The news article in question appears in the record at Doc. #36-6 at 2 (Shayna Jacobs, "Former Manhattan prosecutor Scott Fenstermaker says 9/11 was 'one of the greatest events in human history,'" *New York Daily News* (July 13, 2016)); *see also* Doc. #50-17 at 26–29 (same news article filed by plaintiff).

alleged terrorists and positive view of the 9/11 attacks amounts to a violation of plaintiff's constitutional rights under the First and Fourteenth Amendments. *Id.* at 21, 25–26, 28–29.

Notwithstanding his allegation that the reason that his father purposefully disinherited him was punishment for his controversial activities and views, plaintiff also alleges that the reason that his father disinherited him is because of the undue influence of Czymmek. He claims that Czymmek is a registered dietician who has been caring for their father as his health has declined. *Id.* at 23. To this end, Czymmek worked to "cajole" Lloyd Fenstermaker into granting her "control" over his affairs so she could "manipulate and incapacitate" him. *Id.* at 23–24, 28. She allegedly did this to "punish" plaintiff for his actions in the 2012 family dispute. *Id.* at 24. Although Czymmek's allocation of her father's estate is the same under both the old and updated wills (a 1/3 share), plaintiff nonetheless alleges that she acted to "alienate" him from his father "in an effort to enrich herself" at plaintiff's expense. *Id.* at 34.[3]

Plaintiff further alleges that Lloyd Fenstermaker's decision to disinherit him was improperly influenced by his ex-wife, Linda Fenstermaker. *Id.* at 16. She is not a defendant in this matter, because plaintiff states he is already pursuing claims against her in another court for various alleged wrongdoings, including undue influence. *Ibid*. Plaintiff nonetheless accuses his ex-wife at length of committing fraud and unduly influencing Lloyd Fenstermaker's estate planning decisions. He essentially alleges that she told a series of lies in order to obtain an inheritance that plaintiff views as rightfully his. *Id.* at 16–17.

On December 10, 2016, Lloyd Fenstermaker moved from Delaware to Connecticut, where Czymmek presently lives. *Id.* at 11. He remains in poor health, and Czymmek continues to

---

[3] The amended complaint also includes factual allegations about Czymmek's purported statements to plaintiff that her husband was having an affair and was attempting to use truck drivers to murder her at some point in 2013-14. *Id*. at 17–18 ("Kirk Czymmek Murder Plot"). Other than portraying Czymmek in a negative light, such allegations about a murder plot appear immaterial to the complaint.

5

care for him and manage his affairs. According to plaintiff's amended complaint, his father has suffered at least three strokes and remains hospitalized. *Id.* at 29.

Plaintiff alleges that the activities of his father and sister have exacerbated his own anxiety condition for which he takes medication.[4] *Id.* at 33. He alleges that as a result of their actions, he has sought the treatment of a psychiatrist, doubled the dosage of his medication, and been hospitalized several times. *Id.* at 36–37. Plaintiff reports that he has also been diagnosed with depression and a mood disorder, which he attributes to the actions of his father and sister. *Id.* at 37. He states in an affidavit that he has received intermittent psychiatric treatment on an out-patient basis since the 1980s. Doc. #53-10 at 8. He also alleges that the actions of his father and sister have directly caused his divorce, strained his relationship with his daughters, and damaged his relationship with his brother. Doc. #70 at 37. He blames them for his being unable to work effectively and causing him to lose income as a result. *Id.* at 38.

Plaintiff alleges several claims in his amended complaint. Count One seeks to invalidate his father's will, and Count Two seeks to invalidate his father's revocable trust. Count Three seeks an accounting of his father's assets. Count Four alleges tortious interference with an expected inheritance against Martha Czymmek. Count Five alleges intentional infliction of emotional distress for $2 million against both Martha Czymmek and Lloyd Fenstermaker.

### DISCUSSION

Lloyd Fenstermaker and Martha Czymmek have filed motions to dismiss and a motion for summary judgment.[5] As to defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1)

---

[4] In plaintiff's communication with defense counsel in this matter, he stated: "Please be advised that my New York attorneys . . . will likely seek commissions to depose both my dad and Martha during the discovery phase of my divorce case with Linda. If my dad and Martha would consent to such deposition, that would streamline things greatly. If they do not so consent, their failure to do so may become an issue with respect to the intentional infliction of emotional distress claim which I have brought against them in the instant action." Doc. #36-8 at 2–3.

[5] Defendant Martha Czymmek has filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim (Doc. #41). Defendant Lloyd Fenstermaker has filed three separate motions that each address

6

for lack of jurisdiction, a federal court should ordinarily resolve any doubts about the existence of federal subject matter jurisdiction prior to considering the merits of a complaint. *See, e.g.*, *Singh v. United States Citizenship & Immigration Servs.*, 878 F.3d 441, 445 (2d Cir. 2017), *as amended* (Jan. 9, 2018). Among the reasons why a federal court may not have jurisdiction over a dispute is if a plaintiff does not have an injury-in-fact that gives rise to standing or, relatedly, if the dispute is not yet ripe for a judicial decision on the merits. *See, e.g.*, *New York Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008).

As to defendants' motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim, the Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). This "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Because the focus must be on what facts a complaint alleges, a court is "not bound to accept as true a legal conclusion couched as a factual allegation" or "to accept as true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014).

In short, the Court's role in reviewing a motion to dismiss under Rule 12(b)(6) is to determine if the complaint—apart from any of its conclusory allegations—alleges enough facts to state a plausible claim for relief. The same plausibility principles that govern a motion to dismiss pursuant to Rule 12(b)(6) apply with equal force to the evaluation of the Court's subject

---

different counts of the complaint: a motion to dismiss Count One for lack of subject matter jurisdiction (Doc. #27), a motion to dismiss Count Three for lack of subject matter jurisdiction (Doc. #28), and a motion for summary judgment on Count Two (Doc. #29). To the extent that the summary judgment motion as to Count Two relies on facts concerning the trust, these facts are either not disputed or not necessary to my conclusions as to the lack of subject matter jurisdiction, and therefore I will rule on this motion as a matter of law for the reasons set forth in this ruling. Moreover, because the amended complaint itself refers to and incorporates the terms of the trust, it is proper for the Court to consider the terms of the trust for purposes of the motions to dismiss.

matter jurisdiction pursuant to Rule 12(b)(1). *See Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155–56 (D. Conn. 2016) (extended discussion).

Plaintiff is proceeding *pro se*, and the Court usually construes the pleadings of a *pro se* party in a non-technical manner to raise the strongest arguments that they suggest. *See, e.g.*, *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017) (*per curiam*). But when a *pro se* party is an attorney, a Court is not obliged to construe his papers liberally. *See Davey v. Jones*, 2008 WL 5061631, at *3 n.6 (S.D.N.Y. 2008). Because plaintiff is a graduate of Harvard Law School and a highly experienced litigator, there is no reason to extend the latitude that the Court ordinarily affords *pro se* litigants. *See* The Law Offices of Scott L. Fenstermaker, P.C., http://fenstermakerlaw.com (website describing educational background and more than 22 years of legal experience with dozens of cases in the federal and state courts).

### *Counts One and Two - Invalidation of Will and Trust*

Plaintiff seeks to invalidate the will and revocable trust of his father, even though as plaintiff concedes his father is "still very much alive." Doc. #53 at 16. Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The reason for the case-or-controversy limitation is to restrain the federal courts from enmeshing themselves in deciding abstract and advisory questions of law. Accordingly, any federal court plaintiff must have case-or-controversy "standing" to assert a claim—specifically, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, (1992)); *see also E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 449–50 (2d Cir. 2014).

The first requirement—that a plaintiff have sustained an injury-in-fact—"helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). An injury-in-fact must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Ibid.* (quoting *Lujan*, 504 U.S. at 560) (some internal quotation marks omitted); *see also E.M.*, 758 F.3d at 449.

A closely related issue is the constitutional doctrine of ripeness, which is best viewed as "a specific application of the actual injury aspect of Article III standing." *National Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). Under this doctrine, a party's claim is not ripe if plaintiff's claimed injury is "conjectural or hypothetical" rather than "imminent or actual." *Ibid.* "A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Ibid.* (internal quotations omitted). Absent such a claimed injury, "there simply is no present case or controversy sufficient to satisfy the strictures of Article III." *Id.* at 688 n.5.

Plaintiff's claims to invalidate his father's will and revocable trust are not ripe for adjudication. As no more than a theoretical beneficiary of the will and the trust, plaintiff presently has no imminent or actual injury. *See Kennedy v. Ferguson*, 679 F.3d 998 (8th Cir. 2012) (plaintiff's lawsuit against attorney for malpractice re his legal work for father's estate not ripe while probate proceedings still pending); *Hodge ex rel. Skiff v. Hodge*, 78 F. Supp. 2d 29, 33 (N.D.N.Y. 1999) (declining to issue declaratory judgment invalidating last will and testament of person who was still alive, noting that "because [the devisor] is currently alive, issues involving the validity of her Last Will and Testament are likely not even ripe for adjudication by *any* court"); *cf. Conis v. Showalter*, 2015 WL 1839254, at *1, 4 (W. Va. 2015) (rejecting claim by son to challenge his parents' sale of a farm for which he believed that it had been "his

9

parents' long-standing intent to pass the farm to him at their deaths," and noting that "[b]ecause petitioner's parents are currently living, petitioner has no more than a conjectural or hypothetical interest in the former family farm" and that "[w]e find that the alleged deprivation of such an abstract interest cannot serve as a basis for an injury in fact.").

Plaintiff lacks a cognizable injury-in-fact because he is not entitled to any of his father's property under the will while his father is still alive. Under Connecticut law, "a beneficiary has no legally protected interest in or entitlement to a decedent's estate while the testator is still alive; at most, such a potential beneficiary has an 'expectancy,' which affords no legal rights." *Birmingham v. Cotton*, 2010 WL 3925128, at *5 (D. Conn. 2010); *Zanoni v Hudon*, 42 Conn. App. 70, 75 (1996) (same). "At best, such a beneficiary or inheritor has a unilateral hope of one day receiving some portion of the decedent's estate. A mere hope, however, does not afford enforceable property rights." *Birmingham*, 2010 WL 3925128, at *5.

The fact that Delaware law prescribes a pre-mortem procedure to challenge a will or trust in a state court prior to a testator's death does not mean that there is constitutional standing to allow such a challenge in federal court. An "essential difference" between state and federal courts is that "the federal courts are courts of limited jurisdiction and that the state courts are courts of general jurisdiction." *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 716 (6th Cir. 2011) (Sutton, J.). Indeed, "[m]ost state courts … have 'public interest' exceptions to their mootness, standing and ripeness doctrines, and in most instances permit their appellate courts to entertain appeals about issues of 'continuing public importance' after the cases otherwise become moot on appeal." *Ibid.* (emphasis omitted). That's not how federal courts work in light of the irreducible requirements of ongoing Article III standing. *See also Lundy v. Hochberg*, 91 F. App'x 739, 742–45 (3d Cir. 2003) (despite suing under state law cause of action

10

for unauthorized practice of law, plaintiff had no Article III standing to maintain claim in federal court absent injury in fact).

Even if I were to consider the merits of plaintiff's claim, I would conclude as to Count One that any cause of action under Delaware law fails, because as plaintiff concedes, Lloyd has moved out of Delaware. Doc. #70 at 2, 6, 15; Doc. #53 at 2–3. As such, it is highly doubtful that procedures for pre-mortem validation of the will under Delaware law, 12 Del. Code. §§ 1309–11, would apply insofar as it contemplates the decedent resides in Delaware. Plaintiff himself both cites this provision as the basis for his claim, and also acknowledges that the statute "only applies when the testator resides in Delaware at the time of his or her death." Doc. #70 at 15. Plaintiff does not point to any other state law from Delaware or Connecticut that would allow a pre-mortem challenge to a will or related testamentary trust.

Nor does plaintiff have any non-frivolous constitutional claim against his father arising from any disapproval by his father of plaintiff's representation of alleged 9/11 terrorist defendants or his other beliefs and opinions. The First Amendment as incorporated through the Fourteenth Amendment does not apply to private parties, unless those parties are engaged in state or governmental action. *See, e.g.*, *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 263–64 (2d Cir. 2014).

It is obvious that Lloyd Fenstermaker is not engaged in state action. To circumvent this fact, plaintiff claims that the probate court's conjectural enforcement of the will and trust would constitute state action under the rule of *Shelley v Kraemer*, 334 U.S. 1 (1948), in which the Supreme Court concluded that the actions of state courts to enforce racially restrictive covenants may qualify as state action for constitutional purposes. But this argument ignores that there has been no state court action yet to approve Lloyd Fenstermaker's will and trust.

11

Moreover, the rule of *Shelley v. Kraemer* does not convert every testator into a state actor, thus making it unconstitutional whenever a parent might disinherit a child because of the parent's disagreement with the child's political views or activities. "Because a testator or the settlor of a trust is not a state actor, there are no constitutional dimensions to his choice of beneficiaries." *In re Estate of Feinberg*, 235 Ill. 2d 256, 284 (2009) (rejecting similar reliance on *Shelley v. Kraemer*). Indeed, "[e]qual protection does not require that all children be treated equally; due process does not require notice of conditions precedent to potential beneficiaries; and the free exercise clause does not require a grandparent to treat grandchildren who reject his religious beliefs and customs in the same manner as he treats those who conform to his traditions." *Ibid.*; *see also Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 69 (2d Cir. 1976) (state's provision of neutral judicial forum does not entail state action under rule of *Shelley v. Kraemer*).

In short, plaintiff has no standing to sue to invalidate his father's will or living trust while his father remains living. Nor has he stated a claim on the merits for which relief may be granted. The claim against defendant PNC Bank is also subject to dismissal because the bank is named as a defendant only in its capacity as trustee for his father's trust. Doc. #70 at 2. Accordingly, the Court will dismiss Counts One and Two for lack of standing and, in the alternative, for failure to state a claim.

### *Count Three - Accounting of Assets*

Plaintiff requests that the Court order an accounting of his father's assets from November 28, 2016, to the present. Plaintiff does not identify any statute or law that affords plaintiff the right to any pre-mortem accounting of his father's assets. Plaintiff's opposition papers do not respond to defendant's argument that he has no such right, and therefore the Court deems plaintiff to have abandoned any cause of action for an accounting as alleged in Count Three. *See*

*Eder v. Eder*, 2014 WL 3511640, at *9–10 (Conn. Super. Ct. 2014) (no right to accounting from *inter vivos* trust unless one is beneficiary of trust); *Hodge*, 78 F. Supp. 2d. at 34 (dismissing demand for an accounting and constructive trust over property of testator who was still living). The Court will therefore dismiss Count Three.

### *Count Four - Tortious Interference with Expectancy*

Plaintiff alleges that his sister Martha Cyzmmek has tortiously interfered with his expected inheritance in his father's estate. Connecticut courts are divided on the issue of whether there exists a cause of action for tortious interference with an expected inheritance. *See Eder*, 2014 WL 3511640, at *3–9 (citing cases). Even if I assume that such an action might be maintainable in the state courts of Connecticut, I conclude that plaintiff does not have federal constitutional standing to pursue such a claim while his father is still living and while it remains wholly conjectural what will occur with his father's estate. In view that plaintiff has no cognizable injury for any change to his father's will, plaintiff likewise has no standing at this time to sue his sister for tortious interference. *See, e.g.*, *Zak-Rejinak v. Rejniak*, 2016 WL 4202984, at *2 (Conn. Super. Ct. 2016) (plaintiff had no standing to challenge mother's pre-mortem transfer of property to plaintiff's siblings; "Because the plaintiff never had any ownership in the property, there is no injury to her as a result of the transfer. The transfer only effected the rights of the owner, [plaintiff's mother]").

Moreover, plaintiff has not alleged plausible grounds for relief because he cannot plausibly allege any damages until the death of his father. *See DePasquale v. Hennessey*, 2010 WL 3787577, at *2 (Conn. Super. Ct. 2010) (recognizing port-mortem cause of action for tortious interference with an inheritance and to include an element of "actual damages to the plaintiff resulting from the defendant's tortious conduct"); Restatement (Second) of Torts § 774B cmt. (C) (1979) (noting "[a]n important limitation upon the rule stated in this Section is that there

can be recovery only for an inheritance or gift that the other would have received but for the tortious interference of the actor," such that "there must be proof amounting to a reasonable degree of certainty that the bequest or devise would have been in effect at the time of the death of the testator or that the gift would have been made *inter vivos* if there had been no such interference"). Accordingly, plaintiff has not stated a plausible claim for tortious interference with expected inheritance. I will therefore dismiss Count Four for lack of standing and failure to state a claim.

### *Count Five - Intentional Infliction of Emotional Distress*

Plaintiff also accuses his father and sister of intentionally inflicting emotional distress on him. To state a claim for intentional infliction of emotional distress a plaintiff must adequately allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 526–27 (2012). As to the second factor, the alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 527.

I conclude that plaintiff's allegations do not satisfy this high threshold. Plaintiff's emotional distress claim against his father is premised primarily on the disinheritance and communications related thereto. His claims against his sister are similarly based primarily on the same facts underlying his undue influence claim against her. Plaintiff adds a few additional facts to bolster his emotional distress claim, such as an allegation that both his father and sister falsely claimed that plaintiff's daughter attempted to commit suicide. Doc. #70 at 34, 36. But plaintiff

14

has not plausibly alleged that one who disinherits a child or influences a parent to disinherit a sibling has committed the kind of outrageous conduct that is required to sustain an intentional infliction of emotional distress claim. Plaintiff is upset at being excluded from his father's estate, but this does not transform his father's lawful conduct into a tort. Nor do the few additional factual allegations support a claim that either plaintiff's father or sister engaged in outrageous conduct of the kind that rises to a compensable claim for intentional infliction of emotional distress. *See Golnik v. Amato*, 299 F. Supp. 2d 8, 14–16 (D. Conn. 2003) (noting that whether a defendant's conduct is sufficiently extreme and outrageous is for the court to decide in the first instance, that "the federal courts in this District, applying Connecticut law, have interpreted the qualification of extreme and outrageous conduct strictly," and then surveying large number of cases found to be inadequate to support claim for intentional infliction of emotional distress). Accordingly, the Court will dismiss Count Five for failure to state a claim.[6]

### *Motion for Costs and Fees Pursuant to Rule 4(d)*

Plaintiff has also moved for cost and fees pursuant to Rule 4(d) of the Federal Rules of Civil Procedure. Under Rule 4(d)(2), a defendant who fails to sign and return a waiver requested by a plaintiff is required to pay for expenses incurred by plaintiff in making the service. Plaintiff has provided documentation demonstrating that he sent waiver of service forms to both his father and his sister at his sister's address in Connecticut. Although the waiver forms themselves certify that they were sent on May 12, 2017, plaintiff attests that they were sent on May 15, 2017, and not delivered to his sister's home until May 17, 2017. *See* Doc. #50-1 at 1–2. Plaintiff ended up serving Czymmek with process on June 14, 2017. Docs. #17–19.

---

[6] Although only defendant Martha Czymmek has moved to dismiss Court Five, I conclude pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) that dismissal is warranted for the same reasons as to the same count as alleged against defendant Lloyd Fenstermaker.

15

Under Rule 4(d)(1)(F), a defendant has "a reasonable time of at least 30 days after the request was sent" to return the waiver. Because the waiver in this case was sent on May 15, 2017, this minimum thirty-day period did not end until June 14, 2017. But plaintiff did not wait for the period to end, and he instead prematurely served his sister on June 14, 2017. Because the minimal time to return the waiver had not expired, his sister is not obligated to pay plaintiff's costs under Rule 4(d). *See Cobalt Multifamily Inv'rs I, LLC v. Arden,* 2014 WL 3798183, at *3 (S.D.N.Y. 2014).

Defendant Lloyd Fenstermaker was served on June 15, 2017. Doc. #16. But the record does not show that the waiver of service was sent in the first instance to his father's correct address where he was eventually served. Accordingly, I will deny plaintiff's motion for costs and fees pursuant to Fed. R. Civ. P. 4(d).

## CONCLUSION

For the reasons stated above, the Court GRANTS defendant Lloyd Fenstermaker's motions to dismiss (Docs. #27, 28) and motion for summary judgment (Doc. #29). The Court also GRANTS defendant Martha Czymmek's motion to dismiss (Doc. #41). Because there is no basis for a claim against these defendants, there is also no basis for plaintiff's claim against defendant PNC Bank, who shall also be dismissed as a defendant. Plaintiff's motion for costs and fees (Doc. #50) is DENIED. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 26th day of March 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge